**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ZURICH GLOBAL CORPORATE U.K., ) | NO. CV 08-07066 SJO (FFMx) |
| ) | |
| Plaintiff, ) | **ORDER GRANTING PLAINTIFF'S MOTION** |
| ) | **FOR PARTIAL SUMMARY JUDGMENT** |
| v. ) | [Docket No. 28] |
| ) | |
| BICKERSTAFF, WHATLEY, RYAN & ) | |
| BURKHALTER, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| _____ ) | |

This matter is before the Court on Plaintiff Zurich Global Corporate U.K.'s ("Plaintiff") Motion for Partial Summary Judgment, filed July 23, 2009. Defendant Bickerstaff, Whatley, Ryan & Burkhalter, Inc. ("Bickerstaff") filed an Opposition, to which Plaintiff replied. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for August 17, 2009. *See* Fed. R. Civ. P. 78(b). For the following reasons, Plaintiff's Motion is GRANTED.

I.    BACKGROUND

Caduceus Self Insurance Fund, Inc. ("Caduceus") was a Florida not-for-profit corporation which formed and operated a medical malpractice self insurance fund to pool the medical malpractice liabilities of its members. (Uncontroverted Fact ("UF") No. 1.[1]) Caduceus employed

---

[1] All citations to "Uncontroverted Facts" refer to facts listed in Plaintiff's Statement of Uncontroverted Facts which Zurich has stated are undisputed in its Response to Moving Party's Separate Statement of Uncontroverted Facts.

Spear, Safer, Harmon & Co., P.A. (collectively, "Spear Safer") as its accountant to audit its financial statements from 1994 through 1998. (UF No. 2.) Caduceus also retained Bickerstaff, an actuarial services firm, to perform rate level studies beginning in 1993, and to provide year end reserve analyses, beginning with a report on the 1994 calendar year, which was issued in 2005. In the late 1990s, Caduceus sought a purchaser, and reached an agreement with The Doctors Company ("TDC") in 1998. (UF No. 4.) However, on January 3, 2000 Caduceus declared insolvency and the Florida Department of Insurance was appointed as the Receiver of Caduceus. (UF No. 12.) The Receiver is authorized to bring causes of action on behalf of Caduceus and its policyholders. (UF No. 13.)

In 2002, the Receiver filed suit against TDC, alleging that TDC had breached its contract with Caduceus by failing to provide transition fees and profits due Caduceus. (UF No. 15.) After trial, the Receiver obtained a judgment against TDC from which the Receiver was able to satisfy all outstanding claims, reimburse Caduceus policyholders, and fund reserves. (UF Nos. 16-17.)

From August 21, 1997 to August 21, 2000, Bickerstaff was covered under a professional liability insurance policy (the "Policy") issued by Plaintiff. (UF No. 5.) Pursuant to the Policy, Plaintiff agreed to pay on behalf of the Insured "all sums which the Insured shall become legally obligated to pay as 'damages' as a result of claims first made against the Insured by reason of liability arising out of any negligent act, error or omission in rendering or failing to render 'professional services' . . . as an Actuary or Actuarial, Pension Trust, Employee Benefit Plan or Compensation Consultant whether committed or alleged to have been committed by the Insured or any person employed by the Insured or by others for whom the Insured is legally responsible." (UF No. 8.) In addition, the Policy provides that Plaintiff "shall defend any suit against the Insured seeking 'damages' to which this insurance applies, even if any of the allegations of the suit are groundless, false or fraudulent." (Policy, filed as Stewart Decl. Ex. F, § II ¶ (a). The Policy contains an exclusion that states: "The Insuring Agreements shall not apply to claims or 'costs, charges and expenses' for or arising out of . . . (q) the insolvency or bankruptcy of the Insured or any other person, firm or organization." (UF No. 9; Policy at 4.)

In January 2004, the Receiver filed the "Receiver Action," alleging that Spear Safer failed to properly audit and test the adequacy of Caduceus' loss reserves and failed to discover that the loss reserves were materially under-reserved. (UF 21.) The Receiver's complaint alleges that due to Spear Safer's malpractice, Caduceus' audited financial statements inaccurately presented the true financial condition of Caduceus . . . and enabled Caduceus to operate past the point where it became statutorily insolvent, thereby proximately causing Caduceus to suffer damages. . . ." (Receiver Compl., filed as Lisenbery Decl. Ex. E, ¶¶ 26, 31, 38.) In February 2008, Spear Safer filed a third party complaint in the Receiver Action against Bickerstaff alleging a single cause of action for contribution. (UF 25.) Zurich informed Bickerstaff that it would provide Bickerstaff a defense in the Receiver Action subject to an express reservation of rights to deny coverage based on the applicability of Exclusion (q) of the Policy, and the right to seek reimbursement of any fees and costs expended in connection with the defense of the Receiver Action should it be determined that there is no coverage under the Policy. (UF 27.) In February 2009, Spear Safer amended its third party complaint to allege that Caduceus relied on Bickerstaff's actuarial reports and that, if the Receiver recovers from Spear Safer, it should be entitled to contribution from Bickerstaff. (UFs 35-38.) The amended complaint alleges that Caduceus "voluntarily entered liquidation," and that Bickerstaff "committed professional negligence" causing Caduceus to "(a) lose the opportunity to profit from its business if its rates had been set at an adequate level, (b) lose bargaining power in its negotiations with TDC, and (c) enter liquidation, resulting in substantial administrative and liquidation expenses that otherwise would not have been incurred." (Second Am. Compl. ("SAC") ¶¶ 6, 14, 19, 25.)

In order to determine its rights and obligations under the Policy, Plaintiff filed a complaint for declaratory relief as to its duty to defend and indemnify Bickerstaff in the Caduceus Action along with a request for reimbursement of any expenses spent in defending Bickerstaff. (*See* Pl.'s Compl. 6-7.)

Plaintiff now moves for partial summary judgment on the grounds that the facts are undisputed and the plain language of the Policy precludes any duty by Plaintiff to defend or indemnify Bickerstaff in the Receiver Action. (Pl.'s Mot. 1.)

II.    DISCUSSION

Summary judgment is proper only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one that could affect the outcome of the case, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, courts view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

As both parties agree, California state law governs the interpretation of the Policy. *See, e.g.*, *Humboldt Bank v. Gulf Ins. Co.*, 323 F. Supp. 2d 1027, 1032 (2004). "Interpretation of an insurance policy is a question of law when determining whether a particular policy provides coverage." *Dairy Am., Inc. v. New York Marine & Gen. Ins. Co.*, 2009 U.S. Dist. LEXIS 49227, at *18 (E.D. Cal. ) (citing *Waller v. Truck Ins. Exchange*, 11 Cal. 4th 1, 18 (Cal. 1995)). "While coverage clauses are interpreted broadly, exclusionary clauses are construed against the insurer." *Marquez Knolls Prop. Owners Assn., Inc. v. Executive Risk Indemnity, Inc.*, 153 Cal. App. 4th 228, 233-34 (Cal. Ct. App. 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Partridge* (Cal. 1973)). "Thus, 'when the policy is ambiguous and the insured would reasonably expect coverage based on the nature and kind of risk covered by the policy,' or when 'the underlying suit potentially seeks damages within the coverage of the policy,' the California courts have held that an insurer has a duty to defend its insured against third-party lawsuits." *Conestoga Svs. Corp. v. Exec. Risk Indem.*, 312 F.3d 976, 981 (citing *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir. 1996)). However, "an insurer is entitled to limit its coverage to defined risks, and if it does so in clear language, [courts] will not impose coverage where none was intended." *Titan Corp. v. Aetna Casualty & Sur. Co.*, 22 Cal. App. 4th 457, 469 (Cal. Ct. App. 1994) (internal citation omitted).

Although an insurer's duty to defend is broader than its duty to indemnify, "where there is no possibility of coverage, there is no duty to defend." *Id.* (citing *Fire Ins. Exchange v. Abbott*, 204

4

Cal. App. 3d 1012, 1029 (Cal. Ct. App. 1988)). "Determination whether the insurer owes a duty to defend is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Id.* (citing *Waller*, 11 Cal. 4th at 19)). "To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose Chem. Corp. of Cal. v. Superior Court*, 6 Cal. 4th 287, 300 (Cal. 1993) (emphasis in original).

A.  The Exclusion is Conspicuous.

Bickerstaff's first argument is that the exclusion is invalid because it is not conspicuous. "The insurance company's obligation to provide coverage can be limited only by exclusions phrased in language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Everest Nat'l Ins. Co. v. Valley Flooring Specialties*, CV 08-1695, 2009 U.S. Dist. LEXIS 36757, at *21 (E.D. Cal. Apr. 14, 2009) (citing *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 809 (Cal. 1982)). California courts have invalidated exclusions as inconspicuous "where not in a section labeled exclusions and placed on an overcrowded page, or in a section labeled "General Limitations" but in a "dense pack" format, or hidden in a subsequent section of the policy bearing no clear relationship to the insuring clause and concealed in fine print." *Id.* (internal citations omitted). "However, the California Supreme Court held an exclusion clause conspicuous as a matter of law when it was found in a section under the bold face heading 'Exclusions,' in printing the size and intensity identical to the rest of the policy." *Id.* at *22-23 (citing *Nat'l Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 384-85 (Cal. 1976)).

Here, the insolvency exclusion is clearly and legibly listed under a capitalized heading entitled "EXCLUSIONS," and is of identical size and intensity as the remainder of the policy. (*See* Policy at 3.) In addition, the exclusions are separated by blank lines so as not to be in a "dense pack." *Id.* As a matter of law, the exclusion is conspicuous, notwithstanding the fact that it is one of 18 exclusions listed in the policy. *See Nat'l Ins. Underwriters*, 17 Cal. 3d at 384-85; *see also*

1  *Ponder v. Blue Cross of S. Cal.*, 145 Cal. App. 3d 709, 722 (Cal. Ct. App. 1983) (holding exclusion

2  with these characteristics conspicuous as a matter of law).

3      B.      The Exclusion is Unambiguous.

4      "Insurance policies are construed under the same rules that govern the interpretation of

5  other contracts.  Accordingly, [the Policy] must be interpreted to give effect to the mutual intent of

6  the parties at the time of contracting, and such intent is ascertained, if possible, from the 'clear and

7  explicit' language of the contract.  If contractual language is clear and explicit, it governs.  On the

8  other hand, when policy language is ambiguous, rules applicable to resolving ambiguity control."

9  *St. Paul Mercury Ins. Co. v. Frontier Pac. Ins. Co.*, 111 Cal. App. 4th 1234, 1243 (Cal. Ct. App.

10  2003) (citing *St. Paul Fire & Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th

11  1038, 1048 (Cal. Ct. App. 2002)).

12      "An insurance policy provision is ambiguous when it is capable of two or more constructions

13  both of which are reasonable."  *Id.* (citing *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins.

14  *Co.*, 5 Cal. 4th 854, 867 (Cal. 1993)).  "Although each term must be read in its 'ordinary and

15  popular sense,' it must also be interpreted in the context and with regard to its intended function

16  and the structure of the policy as a whole."  *Garamendi v. Mission Ins. Co.*, 131 Cal. App. 4th 30,

17  42 (Cal. Ct. App. 2005) (internal citations omitted).

18      Here, the insolvency provision excludes coverage for "claims or 'costs, charges and

19  expenses', for or arising out of . . . (q) the insolvency or bankruptcy of the Insured or any other

20  person, firm, or organization."  (Policy at 4.)  As both parties concede that Caduceus "declared

21  insolvency" (UF No. 12), and a Florida court has found that Caduceus "admitt[ed] insolvency"

22  (Order Approving and Directing the Assessment of Fund Members, filed as Lisenberry Decl. Ex.

23  A at 2), the Court finds that Caduceus was insolvent for purposes of the Policy.  Thus, the only

24  disputed term in the policy is "arising out of."

25      "Courts in California and elsewhere have consistently given a broad interpretation to terms

26  such as 'arising out of' in various kinds of insurance provisions.  It is settled that this 'arising out

27  of' language does not import any particular standard of causation or theory of liability into an

28  insurance policy.  Rather, it broadly links a factual situation with the event creating liability, and

6

connotes only a minimal causal connection or incidental relationship." *Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal. App. 4th 321, 328 (Cal. Ct. App. 1999) (citing multiple cases in which courts found "arising out of" unambiguous in exclusionary clauses).

Bickerstaff argues that the phrase "arising out of" is ambiguous because it could reasonably be interpreted to mean that coverage is excluded: (1) "if Bickerstaff causes a third party's insolvency"; (2) "if the damages claimed would not exist but for the insolvency of a third party"; or (3) "if the damaged company is insolvent at the time it files suit." (Def.'s Opp'n 11.) Despite Bickerstaff's contentions, the plain language of the exclusion does not support these interpretations. As to Bickerstaff's first proposed alternative interpretation, the plain language of the exclusion has no causation requirement. Instead, it broadly excludes claims, costs, expenses and charges "arising out of" the insolvency of Bickerstaff or any other person, firm or organization. As California law is clear that the phrase "arising out of" "broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship," the use of this phrase in the Policy cannot be reasonably interpreted to require that Bickerstaff cause the insolvency. *See Acceptance Ins. Co.*, 69 Cal. App. 4th at 328. Similarly, the plain language of the exclusion contains neither a "but for" requirement, nor a requirement that the damaged company be insolvent at the time of any lawsuit. Thus, by its plain language the exclusion does not limit its application to any of the three circumstances proposed by Bickerstaff. As courts "will not rewrite the insurance contract to impose coverage where none was intended," and "will not indulge in tortured constructions" to find coverage, the Court cannot find Bickerstaff's proposed interpretations reasonable. *See Titan Corp. v. Aetna Casualty & Sur. Co.*, 22 Cal. App. 4th at 469. The Court therefore concludes that the exclusion is unambiguous.

Bickerstaff's discussion of the Policy's exclusion (o) is also unconvincing. Bickerstaff contends that because exclusion (o), which excludes claims and expenses "involving the insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any insurance company in which the Insured has placed or obtained coverage to a client or an account" uses the word "receivership," "[Plaintiff] knew how to exclude coverage for claims that involved an insurer being placed into receivership. . . . It did *not* exclude such coverage in the Insolvency Exclusion."

(Def.'s Mot. 12.)  However, the insolvency exclusion applies to all claims and expenses "arising out of" insolvencies, and therefore encompasses receivership actions that "arise out of" an insolvency.  Moreover, reading the insolvency exclusion not to apply to receivership actions would conflict with its plain language insofar as those actions arose out of insolvencies.  The Court concludes that the differing language in exclusion (o) and the insolvency provision does not render the insolvency exclusion ambiguous.

C.    The Claim Against Bickerstaff in the Receiver Action Arises Out of Caduceus' Insolvency.

Spear Safer's claim for contribution against Bickerstaff alleges that Spear Safer "relied on the actuarial reports provided by Bickerstaff Whatley to set reserves and rates in accordance with the reports provided, thereby, in accordance with plaintiff's [the Receiver's] current theory, causing Caduceus to (a) lose the opportunity to profit from its business if its rates had been set at an adequate level, (b) lose bargaining power in its negotiations with TDC, and (c) enter liquidation, resulting in substantial administrative and liquidation expenses that otherwise would not have been incurred." (UF No. 38.)  Spear Safer also alleges "that Caduceus' insolvency was 'directly caused by the failure to set adequate loss reserves and loss expense reserves' and that the 'loss reserves and loss expense reserves that the [State of Florida] alleges were inadequate were set by Caduceus based on the actuarial reports provided by Bickerstaff.'" (UF No. 39.)  Based on these allegations, it is clear that Spear Safer's third-party complaint against Bickerstaff in the Receiver Action has at least "a minimal causal connection or incidental relationship" to Caduceus' insolvency, and thus "arises out of" it.  *See Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal. App. 4th at 328.

D.    The Doctrine of Concurrent Causation Does Not Apply.

Bickerstaff's last argument is that the doctrine of concurrent causation requires coverage.  Under this doctrine, when a harm is "caused jointly by an insured risk and by an excluded risk . . . the insurer is liable so long as one of the causes is covered by the policy."  *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 102 (Cal. 1973) (finding insurance policy coverage despite exclusion for injuries arising out of the use of a motor vehicle, where insured was sued for

accidentally shooting a passenger in his car when car went over a bump and gun discharged, and insured had filed the trigger of the gun to produce "hair trigger action.")  In *State Farm*, the court noted that the insurance company was liable despite the fact that one of the causes was excluded from the policy, because "both causes were independent of each other." *Id.* 105 n.10.  Moreover, "courts following *Partridge* have made it clear that its holding only applies to 'multiple causes that operated totally independently of one another." *Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819, 835 (Cal. Ct. App. 2006); *see also Daggs v. Foremost Ins. Co.*, 148 Cal. App. 3d 726, 730 (Cal. Ct. App. 1983) ("in order for *Partridge* to apply, there must be two negligent acts or omissions of the insured, one of which, independently of the excluded cause, renders the insured liable for the resulting injuries.")

Bickerstaff relies on *Conestoga*, 312 F.3d 976, for the proposition that concurrent causation can apply to the dual causes of insolvency and malpractice.  (*See* Def.'s Opp'n 19-20.)  In *Conestoga*, an insurance brokerage firm, Conestoga Services Corp. ("Conestoga"), obtained an insurance policy from Executive Risk Indemnity, Inc. ("Executive Risk") covering "wrongful acts" it might commit in the performance of its "professional services." *Conestoga*, 312 F.3d at 978. The policy excluded coverage for claims based on, arising out of, or resulting from the bankruptcy of, among others, "any self insurance plan." *Id.* at 979.  Conestoga brokered a surety bond under which the Frontier Pacific Insurance Company ("Frontier") guaranteed the obligations of a self-insurance worker's compensation plan of Standard Brands Paint Company ("Standard"). *Id.* After the bond issued, the state board gave Frontier permission to reduce the bond amount, and sent Conestoga a "decrease rider" to execute. *Id.* Conestoga failed to return the rider to the state board, so it never took effect. *Id.* Subsequently, Standard filed for bankruptcy and defaulted on its worker's compensation liabilities, at which point the state board demanded the original bond amount from Frontier because Conestoga had never returned the rider. *Id.* Frontier sued Conestoga, and Executive Risk denied coverage for defending Conestoga on the grounds that the bankruptcy exclusion applied. *Id.* Conestoga then brought suit against Executive Risk, and although he lost at the district court level, the Ninth Circuit held that the bankruptcy exclusion did not apply to defending Conestoga against Frontier's claims, because "Frontier was seeking

damages equal to the difference between the amount it would have owed on the bond if Conestoga had forwarded the Rider properly and the amount it owed under the terms of the surety agreement *without* the Rider. It is not as if, for example, Frontier were suing Conestoga on the grounds that the Standard surety bond was a poor risk, or *because* Standard went bankrupt." *Id.* at 983 (emphasis in original).

In contrast, in the instant action, the Receiver is suing Spear Safer, and Spear Safer is in turn suing Bickerstaff precisely "*because* [Caduceus] went [insolvent]." *See id.* In other words, in *Conestoga*, Conestoga had nothing to do with the bankruptcy, and although the bankruptcy "was a necessary predicate to the suit, because without it there would have been no default for Frontier to cover," aside from that there was no connection between Conestoga's alleged malpractice and the bankruptcy. Therefore, these two factors were independent causes of the lawsuit. On the other hand, here, the Receiver is suing Spear Safer, and Spear Safer is seeking contribution from Bickerstaff, on the grounds that Spear Safer and Bickerstaff's alleged malpractice caused the damages incurred from Caduceus' insolvency. (*See* Receiver Compl. ¶¶ 26, 31, 38 ("Because Defendants breached their duty, Caduceus' audited financial statements inaccurately presented the true financial condition of Caduceus . . . and enabled Caduceus to operate past the point where it became statutorily insolvent, thereby proximately causing Caduceus to suffer damages. . . ."); Spear Safer SAC ¶¶ 63-64 (explaining Receiver's allegations that Caduceus' reserves and premiums were inadequate, that if Caduceus had known its reserves were inadequate it would have charged higher premiums, and that if it had charged higher premiums, "Caduceus would have (a) had sufficient assets to pay all claims, (b) generated a large profit from operations; (c) been able to negotiate a more advantageous arrangement with TDC, and (d) avoid liquidation"); *id.* ¶¶ 74-75, 91 (alleging that Caduceus relied on Bickerstaff's erroneous recommendations in setting its reserves and premium rates.) In addition, as Plaintiff points out, Bickerstaff asks the Court to find that malpractice is an independent concurrent cause, even when it is allegedly causally connected to the insolvency, or to any of the other causes contained in the exclusions. However, interpreting the Policy in this manner would render the exclusionary clauses meaningless, because malpractice, which is the subject of the insurance

1   policy, would always be a concurrent cause in addition to the causes excluded in the exclusionary

2   clauses, such that coverage would never be excluded.

3          E.      Plaintiff is Entitled to Reimbursement of Its Expenses

4          "An insurer, having reserved its right to do so, may obtain reimbursement of defense costs

5   which, in hindsight, it never owed." *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal. 4th 643, 657

6   (Cal. 2005). Here, in a letter to Bickerstaff, Plaintiff expressly reserved "the right to seek

7   reimbursement of any fees and costs expended in connection with the defense of the Receiver

8   Action should it be determined that there is no coverage under the Policy." (UF 27.) As the Court

9   has determined that Bickerstaff's defense in the Receiver Action is excluded under Exclusion (q)

10  of the Policy, Plaintiff is entitled to recover the costs it expended in providing Bickerstaff's defense.

11  III.    RULING

12         For the foregoing reasons, the Court GRANTS Plaintiff's Partial Motion for Summary

13  Judgment. Plaintiff has no duty to defend or indemnify Bickerstaff in the Receiver Action, and

14  Plaintiff is entitled to reimbursement of the reasonable expenses incurred to defend Bickerstaff in

15  the Receiver Action. Plaintiff shall file a bill of costs on or before **September 28, 2009**.

16

17         IT IS SO ORDERED.

18  Dated: August 26, 2009

19
                                        _____
20                                              S. JAMES OTERO
                                          UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26

27

28